For this special sitting, we're just hearing one case. It's 2570012, Wessinger v. Vannoy. Ms. Brown? Thank you, Your Honor, and may it please the Court, Elizabeth Brown, on behalf of the Warden, Also in the courtroom today are the parents of Stephanie Gazzardo. Stephanie, along with David Breakwell, was murdered by the petitioner over 30 years ago. Due to the heinous nature of those murders, a Louisiana jury sentenced Wessinger to death. In vacating his death sentences, the District Court committed a litany of errors that provide five independent bases for this Court to reverse, as we outline in our briefs. Today, I plan to focus on the three of those issues that present the greatest threats to comedy, finality, and federalism if allowed to stand. First, why all of these post-Wessinger 1 proceedings were wholly improper. Second, why new evidence presented for the first time in federal habeas does not unadjudicate a claim presented to the State Court. And third, why denial of funds is not cause and prejudice. Taken together, the District Court's conclusions on these matters allowed a petitioner to bring an unsupported claim in State proceedings, make a vague demand for funds, and when that request was denied, barrel into federal court, bypass 2254B, D, and E by claiming that the denial of funds prevented him from bringing his current claim. That is a playbook for all future habeas petitioners to undermine the role of Louisiana's courts and evade AEDPA. This Court should reverse, reinstate Wessinger's death sentences, and render judgment in favor of the State. Was that playbook set in any way by us in what I'll call Wessinger 1? In other words, it did seem that the Court there approached it through cause and prejudice. I mean, I don't, I think the best way to understand what happened with Wessinger 1, Your Honor, is that the Court, it came up to this Court where he argued, or he at least admitted that the only way that his claim could possibly prevail is if this Court were to treat it as procedurally defaulted and consider all this new evidence he brought for the first time in State Court and not apply a deference. Wessinger 1 made very clear in its holding that the claim was adjudicated on the merits in State Court. But why didn't the Court just end it there saying Nelson and AEDPA deference? Why did it go through and say there's a funding obstacle here that didn't rise to ineffectiveness? Your Honor, I think that is... Sort of a mystery. It is, it is an odd, an odd feature of Wessinger 1. I think the best way to understand it is Wessinger 1 predated Brodnax and Nelson before this Court made very clear that new evidence can't unadjudicate a claim. So I think we argued that in the first appeal. But, but Pinholster had already said that essentially. I agree, Your Honor, that Pinholster made it very clear and really it... I guess just, just, you know, and I want you to go to your full blueprint, but I see that the Nelson argument is very powerful here. It just, things went a little awry and the District Court seemed to pick up on the cause and prejudice analysis. So I'm less sure it was sort of a gambit of the defendants here. It seemed to be the route and the path he was put under. This is your third point. You're going to say it doesn't succeed on that path anyway, correct? Well, Your Honor, I mean, it was not this Court that put us on this path. It was Wessinger back in 2012. I mean, I think this, this is a very old habeas case. Right, but can we look through Wessinger 1 to get back to 2012 and apply Edba Nelson deference to that ruling? I think what this Court needs to do is look at what Wessinger 1 made very clear, which is that the claim was adjudicated on the merits and the necessary implication of that from Pinholster, Nelson onward is that... No federal evidence. Yes, no federal evidence and you apply 2254D and that ends this case because he, all of his evidence is all new and I don't think he's going to get up here and point to anything in to show otherwise because as we point out, the state court record as to evidence of abuse or brain damage is Wessinger's own statement at, and you can go read the transcript from Dr. Rostow's testimony in the penalty phase at ROA 6650 to 6651, that he was not abused. He had a happy childhood and his only medical complaint. Is there any record evidence though that Hecker knew of the head trauma before Dr. Rostow testified? Your Honor, Hecker's testimony, Hecker's affidavits, which are not part of the state court record, but they make clear that he did not have knowledge of this. He says that the only thing he had based on his talking to family members and presumably talking to Wessinger himself was this alcoholism theory. So that's why that's what he proceeded. He didn't have any knowledge of this. So if perhaps somehow we're just looking at Strickland error, what about their argument that the failure to ask anybody, so you even have the option of something other than alcoholic rage, would be ineffective? There's no case that stands for that or we're not there? Well, there's only speculation that no one asked. I mean, I think that's the first problem is that they flip the burden and place it on us as if we have to prove that Hecker asked this question. That's not our burden. It's their burden to prove otherwise. Nothing in Hecker's affidavit says that he didn't ask about abuse. They don't have anything from Wessinger himself saying that he wasn't asked about abuse. And I think you have to look at what he said contemporaneously, which is that he wasn't abused. And it's unclear to me why we're supposed to believe that Wessinger told Dr. Rostow something that would be different than what he would have told Hecker then. And admittedly, Hecker was under And Rostow says there was some childhood trauma, but it wasn't of consequence. Is that his testimony? It was regarding, I believe it was, there was some knowledge of some minor head trauma. I can't recall whether or not he knew about any minor seizures or not. I don't think he did, but I could be wrong about that. But there was no knowledge of abuse because he said he talked to Wessinger, Wessinger told him, I was not abused. So again, that's what I think, if the idea is that he didn't ask the question, well, had he asked, we have no evidence to say that he would have given a different answer. And then you run straight into what Strickland and Harrington versus Richter make clear, which is that counsel has no responsibility to go do seemingly frivolous investigations. And that's even more true here, where the record is clear that Hecker had only six months to prepare for this case. He sought extensions, which one was granted, but the later one was not. He didn't have the mitigation funding. He didn't have the mitigation expert. He asked for it. It was denied by the trial court. And I mean, that brings us to the cause and prejudice or their cause and prejudice issue, which is this fundamental disconnect that they're going to come up here and claim that it was impossible to find this evidence that they're now putting forth to the court that they brought in the federal proceedings without funding for a trial. And if that's true, then how was Hecker supposed to find it? I think the district court said that he found it directly from the mother or the brother, one or the other, right? He said as to the abuse evidence that it could have been found through talking to Troy Wessinger. That's where he says that neither time nor inadequate resources would have prevented it. But again, if that's the case, then how could post-conviction counsel, how is it not post-conviction counsel's responsibility to have found that if it could have just been found through a phone conversation, that his whole argument is that the state process made it impossible for him to find that evidence. And I don't see how that can be if it was uncoverable through a phone call. The state process doesn't prevent him from calling his client's brother or, again, from talking to his client himself. The best source of Wessinger's childhood should be Wessinger himself. And it's unclear why state funding in the post-conviction process was supposedly necessary for that. But of course, the court doesn't need to get there because this case was over in 2017 after Wessinger won when this court reversed without remanding. That was a final judgment appeal, which meant that in the posture in which it left the district court, there was nothing for the district court left to do but execute the judgment. Then it comes up here, and this court, what it does is it switches from the final judgment being relief to no relief. The district court can't grant summary judgment on a claim after this court has denied relief. It's hard to think of something more contrary to a mandate of reversal, no relief, than granting relief. And so all of this should have stopped with the fact that you can't have a summary judgment motion in that posture. The only thing that he could have brought in the district court was a Rule 60B motion. And the district court concluded that was wholly untimely because it arose 17 months after the Supreme Court denied his petition for rehearing, and he had no explanation for why he waited all of that time. And so Wessinger won, ended the case. And again, this court can just stop there and go no further. But if it wants to go to the next step, the next step is whether or not epidephrine applies under 2254D. And as we were talking earlier, Judge Higginson, the state court record is obvious that this claim was adjudicated on the merits. That's what this court recognized in Wessinger won. That's what this court held in Wessinger won. And I think that's a necessary part of the Wessinger won conclusion as to why they thought his post-conviction counsel wasn't ineffective. Because I don't think this court would have said that he was constitutionally effective had he not presented his ineffective mitigation assistance claim to the state court. I think there would have been enough there to say that maybe you could have had a claim that you should have brought. Of course, on the actual merits, there wasn't ineffective assistance of counsel at the penalty phase. But I don't think this court says that Gislason was constitutionally effective if he failed to raise the claim at all in a posture that made it adjudicated on the merits. Counsel, can I ask you a civil procedure question? Of course. So in 2015, the district court issues its erroneous judgment awarding relief to Mr. Wessinger. 2017, our court reverses, as you point out, without specifying anything more, just says, hey, district court, what you did, the correct answer is the exact opposite of that. So it's not granted. It's denied. The district court does nothing for 19 months or something. So there's no additional, it's not like the district court enters a new judgment. All that is sitting on the district court docket in 2017, 2018, 2019 is the judgment and the mandate of our court. And then there's a 60B motion. So just assume for the sake of discussion that the 60B motion had been filed timely, which it obviously was not. But just assume that it was. What is the judgment that would be, what relief, I'm sorry, put it differently, relief from which judgment is the 60B motion supposed to be operating under? The 2015 judgment is gone. The district court's one. All that's left is ours. Can you file a 60B motion from the court of appeals judgment? In very narrow circumstances where what you're raising is something that has changed after the appeal. So I think if there was an intervening decision by the Supreme Court, so this court issues its judgment, and then the Supreme Court issues something that reverses it, and for whatever reason, there's no cert petition or anything to flip that, I think in that circumstance, if you could maybe bring a timely rule 60B motion, or if there was some extraordinary new fact, outside of this AEDPA context where, of course, you're restricted and this new factual development would not be able to come in. But in an ordinary civil matter, I think in those narrow circumstances where you had some extraordinary post-appeal proceeding, you maybe could bring a 60B motion. But really, the relief that should be sought is to come to this court first and to ask for the court to recall and modify the mandate. And that's what should have happened here, to the extent that there even was this open theory to possibly bring. Of course, our position is that it wasn't because Judge Brady did not reopen the case in 2012 to allow this theory to come up to begin with. But assuming it was, that would be the posture to ask the court to recall and modify the mandate and say there was this alternative basis we had to overcome procedural default. The closest Wessinger ever came to something like that was in his petition for rehearing en banc, which at the end of his petition, he notes that he has this other theory and asks for the court to modify to allow a remand for the court to consider it. And this court denied the rehearing en banc and did not, based on that, modify the mandate. So those are the two things that could have happened. Of course, in habeas, as the Supreme Court denies relief on a habeas claim, the state is entitled to the assurance of finality. So the bar for such a motion is even higher than it would be in an ordinary civil case, because we've already gone through the initial direct appeal, the state post-conviction proceedings, and then a full round of review in the federal side. And again, at that point, there's been a lot of review. A lot of courts have overseen the case. And it takes a lot to allow the case to go forward. And certainly, intentional litigation decisions of choosing to litigate the case first, as if it was adjudicated on the merits, and then switching and saying, oh, no, it was procedurally defaulted, proceeding under Martinez, and I'm going to spend all of this time saying that the reason I couldn't find this evidence is because my counsel was ineffective, certainly then turning around and doing a 180 and saying, oh, no, actually, my post-conviction counsel was fully diligent. It was instead the fault of these external entities who didn't give me funding. That is not an extraordinary circumstance. Those are intentional litigation choices that parties are stuck with. And AEDPA is all about preventing petitioners from doing this constant bait and switch with the state, which that's what this case has been. It was eight years in which this case was treated as if it was adjudicated on the merits. Then Pinholster and Martinez are deciding we have a bait and switch. And now it's all about ineffectiveness of post-conviction counsel. And then that fails. And now we're going to switch and blame the state court process. That's one of the things that's very frustrating from the state's perspective about Wessinger coming up and saying that Wessinger 1 held it was the state process fault. So now you can't argue otherwise. Well, Your Honor, we argued what we argued because we were told this was a Martinez case at that point. And we were told by Wessinger that he wasn't complaining about the funding. That's what he told the district court. That's what he told this court, that it wasn't about the funding until he lost about Martinez. And those are choices, intentional choices that are not to be relieved from. And it's extremely damaging in cases like this where it's been over 30 years since these murders took place. We should not still be here that we won for the first time in 2012 where Judge Brady properly determined this claim was adjudicated on the merits. Then he reversed on a mistaken reading of thinking that there was perhaps an exception under Pentholster. And then this court again rejected that when it came up. And we won again. And then we're still stuck litigating. When were the state court proceedings on I guess they're called the touche factors? Yes, sir. Is that how you pronounce it? Yes, your honor, sir. Touche, that's how I say it. And what's the relevance or deference as to the court's ruling there? I'm sorry, when was the hearing? When was the touche hearing? The conclusion was that he hadn't met the factors, correct? Is that relevant to your position? If this court reaches that issue about whether or not he can overcome procedural default or the ineffective state process theory. Of course, our primary position is that you don't even get to that point because that requires the court to first think that these proceedings were proper. And then second, not apply 2254D in the re-litigation bar. But if the court gets there, that hearing was in I believe 2001 was when the hearing took place. There were actually two hearings related to funding. There was his first request where he they're both in 2001. He first comes up and brings his request for funding soon after he filed, or I think maybe before he filed his initial petition, and says that he thinks he's going to need funding. And what the state court tells him at that point is, well, I think you need to go talk to these other entities. And so he does. And he comes back and he says that they're not going to give him funding. And that's when the state court has the touche hearing to say, I know now you're not, those other entities aren't going to give you funding. Let's find out under state law, have you made the requisite showing to get court-approved funding? And again, that, we agree, that is clearly entitled to, I wouldn't say epideference, it's entitled to absolute deference. It's not even reviewable, is it? I mean, so touche is purely state law. Yes, yes. It's purely a matter of state law as to whether or not you've shown entitlement to. And what was the basis for its conclusion that he hadn't met the factors? The state court's conclusion was that it's, I think you have to kind of read between what the arguments were. Because the state court hears the arguments from Wessinger's counsel and then from the state's counsel, and then says, essentially, that it agrees with the state that he hadn't made the showing of necessity at that time. So the state court's decision was that he didn't show the funds were necessary. Because he had the source of information from the family members? Or it didn't quite close the loop? It didn't, it didn't give a specific reason as to why it thought the funding was unnecessary. I think my reading of it is that the request that was made was pretty vague. It was essentially a listing of all kinds of experts, ballistic experts, forensics experts. Some of it was about the penalty phase. Others of it was about the guilt phase. And so it was essentially asking for experts as to everything. And the state argued, we're not here to re-litigate the whole case. You have to show how this pertains to any of your claims that you're bringing here. And that was part of the disconnect. It seemed like it was, to the state court, I believe, an absolute fishing expedition. He didn't present evidence as to the particular costs, what experts he was going to hire, or any kind of clear direction. It just seemed like he wanted an infinite pot of money. And I think the state, understandably, there's no obligation to provide post-conviction funding at all. And so when the request that's made is extremely vague, it's very understandable why the state court is not going to just sign off on this far-reaching re-litigation of the case. And counsel, I want to make sure I understand your absolute deference proposition. So I just, in response to Judge Higginson. So Estelle v. McGuire says, questions of state law not cognizable in federal habeas can't take a bunch of state law violations, cobble them together, and make a due process violation. I take it the same is true when it comes to this, which is that if there's a state law hearing, a state law standard, a state court adjudicating it, and says, you have these obligations under Touche, or the Louisiana state standards, haven't met them, we can't then cobble those together and turn that into a federal constitutional claim. So if we go back to the original line of inquiry, which is, what is the standard that applies to the Touche hearing? There is not a standard because it's not reviewable? Is that, when you said absolute deference, I just want to make sure I'm tracking with you. As far as it pertains to this court, it is simply absolute deference. The state court made its determination, and that is what it is. Under state law. Under state law, this court cannot review that decision. So it's not a matter of, I mean, the state court could said anything it wanted. This court can't review it. And it's, I think the, I imagine opposing counsel will get up here and say, well, it wasn't a claim, because that was the theory that the district court had, was that, well, this isn't a habeas claim, so therefore, it doesn't fall within 2254D. But it's not a matter of 2254D, because it's not reviewable at all. It doesn't matter that it comes up, that it's raised as a cause and prejudice theory. This court simply cannot review the issue. So it doesn't matter what, why the state court said what it said, but it was, it was a reasoned decision, nevertheless. It shouldn't be reviewed, but it's not like the state court just was willy-nilly rejecting the development of funds. There, even though funds were not required, there was a pathway by which funds could have been acquired. But again, even if there were no funds, that would not be enough to show cause and prejudice, because it doesn't make the state process ineffective to raise claims, because the state is not required to provide such funding to begin with. And it really, I imagine opposing counsel will get up here and talk to you a lot about these other entities and their denial of funds. But as this court already recognized in the first opinion, that it wasn't the other entities and their funding policy that mattered here, it was the state court's decision, which is unreviewable. Now, I imagine opposing counsel also talked to you about the merits of the underlying claim. As we discussed earlier, the first problem with that, if you were to even reach it, is that Wessinger denied all of the abuse. So there's no grounds to say that, that any of this would have been found or that there was a requirement to go investigate abuse or brain damage. There was nothing before his counsel to even suggest that he should go in that direction or any evidence that he actually didn't ask these questions. What we know is had he asked, he would have been told there was no abuse. But I think it's also important to remember just how strong the state's aggravating case was here. These were extremely heinous murders. Wessinger went to that restaurant intending to murder everyone inside. He didn't wear a disguise because his disguise was going to be that everyone was going to be dead. And it's only by the grace of God that that did not happen. He walks in there, he's greeted by Eric Armitage, he shoots him. He then goes and sees Stephanie Gazzardo. She's on the phone with 911 and the jury was able to hear that 911 call where she's confronted by Wessinger. She pleads for her life, please, please, please. And then he shoots her. You hear the phone ring, the phone fall, you hear it go silent. Then you hear a little screak as he is pulling the safe open to get the money inside over her dead body. Then he goes and he tries to shoot Alvin Ricks. The gun doesn't work, so he survives. Then he shoots and kills David Breakwell. Then he leaves on his bike and he spends the rest of the day bragging and flaunting the money. And the second he learns that the state is after him, he flees to Texas. This was a heinous murder. It was an intentional murder. The 911 call is disturbing, it is unsettling, and it is unforgettable. And that is the number one thing that every juror would have had on their mind if Wessinger's attorney had got up before them and talked about some incident when he was threatened with a gun. They would have thought of Wessinger standing there in that restaurant threatening all four of those people with a gun and killing them. I will reserve the rest of my time. Thank you, counsel. Ms. Huntsman. May it please the court, good afternoon. I think we have to get back to where we started this morning, this afternoon, sorry, at four o'clock in the rain. And that was with your question, Judge Higginson. I can't quote you for sure, but it was about did this all start with Wessinger 1? Well, Wessinger 1, we know it established that mitigation IAC was raised and ruled on, correct? And if that's correct, and I think it is, then how do you avoid Nelson? That's not correct. And Wessinger 1 didn't resolve that mitigation IAC had been raised and was decided. Not the mitigation IAC claim is set forth in claim 11C in federal court for which we had a multi-day federal evidentiary hearing. Right, but Nelson is pretty on point in terms of you can't then use the federal evidence to change what was raised before. What you can do, no, it doesn't just say that. And that was the conclusion in that case. But what Nelson says and what generally the issue of exhaustion, fair presentment, comedy, all the things that are important to the court and that the state has mentioned boiled down to was claim 11C fairly presented to the state court? And it was not. And it wasn't simply a matter of changing it with a few affidavits or a few facts here or there. It was a substantially different claim from the one that was presented to the state court judge in either the first amended petition followed by Mr. Gislason or the second amended petition. And by Mr. Gislason's own admission, he testified at the federal evidentiary hearing and he made a tremendous record in the state court. He based those petitions primarily almost exclusively on what was on the record before him. He saw a lot that were problematic, but he hadn't either the funds, the wherewithal, nor the ability to properly present a true IAC claim alleging brain damage and dysfunction in the executive lobe of Mr. Wessinger's brain. That was never presented. That's not a simple amendment or addition. That's a new claim. And let me say this. I'm thinking a lot, as I have and as I must, about the circuit's opinion in Wessinger 1, as we're calling it. If the question was Nelson and Ed Pedefrans, they didn't need to get to the issue of Soren Gislason's ineffectiveness as initial counsel under Martinez. That's their whole opinion. Now, I will be the first to say that when we ask for, under Rule 59E, reconsideration of the initial denial of habeas relief by Judge Brady, we said this claim that you decided on the merits was not fairly presented, which is important, right, for commenting, not fairly presented to the state court. It's technically exhausted because we can't go back and present it and it is now being presented to you, Judge Brady, and we want you to decide this de novo after you decide whether there's cause and prejudice to forgive that procedural default under Coleman. And that's where we... Can I pause you for a second, counsel, because I want to make sure I understand. I confess the splicing of the claims into multiple parts and subparts, it's a little confusing and obviously there's a dispute in this case about where one claim ends and the next one begins. So I want to make sure I understand your position. 11C, you say, is a new claim, never presented to the state court? Never presented in that setting. And let me just think about it. You could, if you don't make this distinction between what's fairly presented to the state court and what's not, someone could just say, I'm just going to say IAC. Oh, I'm well aware of why we need exhaustion. I just want to make sure I understand. When I'm saying, Your Honor, and I apologize for interrupting you, but, nervous, but what I'm saying is, it's a factual decision. Even Nelson says that, as I recall, about whether something is fairly presented, exhausted, et cetera. And it is a little confusing, even reading that decision about one claim, multiple claims. And in Mr. Soren's case, as you may recall, he didn't know he was doing. He was a one-year associate at the Herman Law Firm. He got involved in this case and appointed in January of 2021. You know, he's in front of the judge in April of 2021, the same year, April of 2021, trying to get funding to do his duty as pro bono counsel. He was asked to do this as pro bono counsel because at the time there was no other way for anyone to be appointed. State Bar Association Committee had been formed. We didn't have a Death County Resource Center. We didn't have the CPCPL. There was what's called, affectionately, the donut period, which brings me to another point. Counsel, before we get to your next point, can we finish the one point that I'm trying to ask you about? Go for it, please. In your view, Claim 11C is a new claim? A new claim, yes, sir. Never presented, those were your words, to the state court? It was not fairly presented to the state court as it is constituted in the amended petition that was filed in front of Judge Brady. So we're going to get to the implication of that in a second. I understand that what you said to federal district court is, don't worry, Judge. 11C was never presented to the state court. It is unexhausted, but it's okay because we have cause and prejudice for the default. Is that the gist of the argument? It's technically exhausted because we can't exhaust it now. Why can't you exhaust it now? Because we couldn't go back to state court at that point. It was too late, says the state. Well, that's my question. Did you give the state court a chance to determine whether to hear the claim in not withstanding its procedural rules? There was no basis for it. No one's ever contended, not even the state, that there was a way that we could, at that late date, present that claim in the state court as, basically, a state successor. I understood. Although, as you, I'm sure, appreciate, and death penalty litigation illustrates perhaps more vividly than any other kind of litigation, it's not the state's responsibility to litigate the case for you. So the Supreme Court of the United States has said that every claim must be exhausted in state court. You have to go to the state court, you have to show it to the state court, and you have to say to the state judge, hey, I know we didn't do this before. I recognize that we could be procedurally defaulted, but we're asking for an exception to procedural default, not reasonably available, change in fact, change in law. Obviously, the permutations are as creative or as numerous as the creativity of the lawyers that bring them, but you have to take it to the state court, and if you don't, 28 U.S.C. 2254b says that it cannot be granted in federal court. You have to exhaust it. You have to. And the state court gets to determine whether it's defaulted or not. Not you, not your friends from the Louisiana Attorney General's office. That is not at all my understanding of the law, Your Honor. Obviously, I can be corrected, but I'm not willing to say, agree with you that that's the law. I would cite you to the O'Sullivan case. Now, it is exhausted. It's technically exhausted. The issue is... I'm sorry. I thought we just established that it wasn't. I thought you said you never gave it to the state court in any way. We didn't because it's too late, which makes it technically exhausted, which means the real issue before this court, and I'm going to just make reference to the O'Sullivan case, which basically addresses that, including Judge Stephen's dissent, which they agreed with, about the difference in interplay, which is complex. I may not even explain it very well, between exhaustion and procedural default. Exhaustion means that you have fairly presented the case to the state court, and if you do that and the state court says, we appreciate you showing us the claim, but it turns out you should have done it earlier, you should have done it in a different way, then it's defaulted. The concepts are absolutely related. You're absolutely right to point out that they are related, but they are distinct, and they're distinct in really important ways. Now, it might be that you did, in fact, exhaust this because it is, in fact, an old claim and not a new claim. There are ways around this, but that's why I was asking you at the very beginning of this, if you think it is a new claim, and if you think it was never presented to the state court, never had a chance to adjudicate it, then it's unexhausted and barred under 2244B, end of case. So then the next question I have for you is, even if we're wrong about all of that, did you exhaust the ineffective assistance of counsel claim? That is the source of the cause and prejudice. Did you exhaust that in the state court? The prejudice of Mr. Gislason? Yes. Did you present all those claims to the state court? No, Your Honor. First of all, let me just say, I believe there is law that says you don't have to go back and have the court tell you no when you know it's no. And again, the state has never said we can go back to the state court and exhaust it. So leaving that where it is, the issue of Soren Gislason's, under Martinez, ineffectiveness is initial post-conviction counsel, which is why the claim wasn't exhausted. And we're asking for that failure to present the claim fairly as it is to the state court for comedy purposes. The reason that wasn't done because of his ineffectiveness or because of the ineffectiveness of the state process, we offer two to Judge Brady. He went forward with Martinez. It's a federal decision that does not have to be We're not talking a claim here. We're talking procedural default under Coleman and whether, in light of our federalism and all those concerns, if initially under Martinez, and there have been changes to it, if initial counsel, initial counsel, who's the first person to ever raise this in the state post-conviction court, these issues, is ineffective per the federal court under Martinez and his efforts, then that can be the basis for the failure to have presented fairly that claim you're now offering in federal court to Judge Brady as we did. And that's a federal decision. There's no difference to the state there. And secondly, with respect to the issue that is now, while we're here before you, that Judge DeGrave ruled in our favor on the alternative cause that was sitting there, that I moved my first ever, I think, summary judgment motion, I might add, as a being a criminal defense lawyer. But my summary judgment motion for, claim's still there. As you pointed out, judgment's still there. There's nothing to, no judgment to complain about from the district court. We won. All I'm asking is the judge goes and looks at that one thing that's just sitting there that practically we were invited to do by Wessinger won. They said there is not a thing. Don't even consider what he should have done under Touchet or any of that. They said there is nothing more that Mr. Gislason could have done in state court. And he did paper that record with all the issues, with affidavits about what you need. He wasn't asking, it wasn't a fishing expedition or a pot of gold. He was doing his pro bono duty to this client. And he was doing the best he could. And he made a record. And this court in its infinite wisdom said, no, Ms. Hudsmith, he may have thought he was ineffective. He may feel it. He may have cried on the witness stand when he testified about this in front of Judge Brady. But the fact of the matter is, he did the best that was humanly possible given those circumstances. And you know what? Those circumstances included, and he made a record of that too, God bless him, was the way, and it only applies to Todd Wessinger. We're not talking about changing the whole makeup of, I don't know, how was it put, what everybody's going to try to do after this. This is a one-off. Well, respectfully, that's, I mean, I'm trying to give you as much leeway as I possibly can interpreting Wessinger won as a victory for yourself is very difficult for me to listen to quietly. But I'm trying to do it respectfully. Obviously, it's a resounding rejection of your position and a holding that you lose under the Sixth Amendment. But I'm trying to give you your opportunity to make this case. But the idea that you could do this maneuver and it would not drive a truck through AEDPA is, I just, I can't let it go. Because, I mean, your view, if I'm understanding it is, you get to go into federal court and create a new claim with new facts, a new evidentiary hearing, never presented to the state court, and then use that to get de novo review using ineffective assistance of state habeas counsel claim that's never presented to the state court either. So it is, that is a pot of gold. And that would be the kind of thing that would be truly pathbreaking and perhaps fodder for summary reversal by the Supreme Court of the United States. Because it's just, that would mean that these ineffectiveness claims completely escape and provide de novo review for everyone in federal court. Because everybody wants to come in and use, notwithstanding the prohibitions on evidentiary hearings under 2254E, notwithstanding Cohen versus Penholster and all the Supreme Court's instructions about this, notwithstanding the presumed correct factual determinations that are also in 2254, everybody wants to come into federal court and say, I would like to develop new facts here, notwithstanding what I did in state court. And then this would be a perfect roadmap for them. That would apply to everybody, yes? It would not. And this is why, because nobody else has what Soren Gislason was faced with and essentially recognized by Wessinger I with respect to the ineffectiveness of the state post-conviction system to effectuate the rights of Mr. Wessinger when he was representing him in state post-conviction. And Your Honor, I hear what you're saying. I acknowledge that we're asking for a lot, but I believe under the law we're entitled to it because ultimately this whole system of AEDPA and federalism and all that we all understand and comedy and respect, if the state's not going to do what they're supposed to do, if they're going to make it impossible for a good, decent human being, pro bono lawyer like Mr. Gislason, one of my heroes, to go in there and fight this battle without much support from anyone, the state said as a matter ultimately of policy, of LIDAB board policy, you will not get any of the money we've given to CPCPL because you were pro bono, because you answered the door when Judge Berrigan and Judge Barbier knocked and said, would you do this pro bono because we're all we've got. So this isn't, that's what I mean when I say this is a very unique and unusual situation, but yes, what it ultimately means, what Judge D. Gravel found is that, yeah, we are entitled because Penn-Ulster deals with claims that were decided on the merits. This wasn't. Elevency was not decided on the merits. And you know why? Because of the state. And so we, you as federal judges, should not be so deferential to them when they had every opportunity to do the right thing and was presented to it by Soren Gislason and said, no, no, no. You know, you get, he said, I went to the judge and I had him and said, it's April. It's April 10th. You said, I have to file something. I can't do it. Judge, he gives them to you. I'm a little confused. We did say in West New York, Gislason was not ineffective. That's right. So how does that cause, how does the funding obstacle impediment, whatever we want to call it, relate back to HECR? No, no, no. We're talking. Okay. Let me, my fault. Let me clarify. That's a good question. This is right now. I'm not talking about HECR. If you want to talk about HECR, we, that's a separate question. I'm not, I'm talking about HECR. We have to get to HECR. Yes, we do. Okay. Do you have any Strickland case where the IAC, mitigation of IAC is based on evidence that the very witnesses that lawyer put on the stand? Can you know any case where we've reversed based and found IAC when the witnesses who had the information were the witnesses that the attorney put on the stand? Okay. First of all, there's no evidence, despite what the state may have alleged, that Mr. HECR asked anybody anything other than what he asked them on the witness stand. Because I'm just asking you, can you think of a Wiggins claim premised on evidence that the very witnesses that defense attorney did put on the stand? Can you think of a case where that's been found? I can think of many a case where a defendants, a defense attorney said, I didn't do any investigation. I didn't have any mitigation witness. And as the evidence showed with the brother, Troy Wessenter, he got those witnesses there and Mr. HECR briefly talked to them before he put them on the witness stand. So that is ineffectiveness under any case. But he found the medical, Dr. Rostow, he found him and the testimony coming out of his own medical expert was, we knew about childhood trauma, but it was inconsequential. They didn't say it was inconsequential, but what they did... What did Dr. Rostow say? He said, we knew about minor childhood trauma. I thought the word was, but it was inconsequential. What they said was... No, not they, Dr. Rostow. Dr. Rostow was, this is an issue of alcoholism. No, but he spoke about child... You don't think he ever said anything about... I don't recall him saying anything about childhood trauma. He may have, Judge. I could be wrong. There's a gazillion documents here and I apologize to you all for all the pleadings, but it's a tough case. It's an important case. They've asked for more time. I've asked for more time. They've raised new issues. I've raised new issues. We've professionally done this and it's a lot of work and I know we're bringing it to you now. I'm just a little... I'm really just asking, is there a case applying Wiggins premised on information that was known directly by the mother, the brother, the aunts, all the witnesses that Hecker put on the stand and now apparently, if I'm right in recollection, by Dr. Rostow, his medical expert. They all had the information about childhood trauma. There is no requirement that Todd Wessinger's mother and brother and aunt and uncle and friend and whoever else testified, that they go sit, make Billy Hecker sit down with them and they tell them the history of Todd Wessinger. That is the obligation of Mr. Hecker. Okay, now I'm asking you for a case. I'm asking you for a case where Wiggins, Rompillo, the witnesses owned, those were cases where the witnesses themselves provided the alleged mitigation evidence? There are cases where the attorney did not properly investigate a mitigation case and he did... Putting someone on the witness stand to say, is Mr. Wessinger a nice guy and love his sister with cerebral palsy, is not an investigation. Well, I think the state court said it was a fairly strong strategy to say it was a moment of alcoholic rage from an individual who otherwise was a good father and had a job. This is getting into the double-edged nature of saying, okay, we may have known about childhood trauma, but that's not going to sell well to a jury. There are tons of cases, Your Honor, in which it's not double-edged to have an executive functioning hole in your brain because you had a pediatric stroke. That's what Dr. Woods ultimately testified to. So no, this is not... You might want to know that Mr. Hecker said, I didn't even prepare these witnesses. I didn't talk to them. We've read the affidavit, Mr. Hecker. I mean, is that enough under the Sixth Amendment? Is that what you're saying? Well, you're the one who's arguing to us, counsel. It is not. That's my answer and that's my argument. It is not. I mean, it is absolutely not effective assistance of counsel, and two federal judges have said so. Can I ask you about Nelson? The state relies on it heavily, heavily, heavily, and you don't discuss it or distinguish it. Can you? I can. Nelson is a complicated case, as we've already discussed, and I think Judge Oldham recognized, and I had to agree. But basically, Nelson says there's one ineffectiveness claim, one ineffectiveness claim, one ineffectiveness claim, and it was fairly presented to the state court. But in so doing, Nelson says what the law is, what I'm arguing to you, and that is, one, it's a factual determination, highly factual. So you've got to look at every case. You've got to look at the facts of every case. Secondly, there has to be a fair presentation to the state court, and there cannot be a substantial alteration. So that law is still the same. I'm just asking that it be applied, and this is not a rule of orderliness issue. It's another case with another set of facts. We're our case with our set of facts. It's a guide for me, you, the state, the court, but it's not determinative because it's a different set of facts. I mean, this is the point I'm going to try to make in my five minutes if I can, and I'm not necessarily good at this. I'm jumping around. I apologize. The whole idea of AEDPA, comity, as you present to the state court, it's their conviction. Give them the first bite at the apple. Let them decide whether this is a valid claim. Soren Gislason was not able to do that. I contended, we contended for two reasons. One, because of the cause provided by Martinez, his ineffectiveness, which is over. Law of the case, mandate rule, I have to accept that. Soren was not, per Wessinger 1, ineffective. More to the point, the Fifth Circuit says there's nothing he could have done, and you know why? Because the state process was so, made it impossible for him to go beyond the record in arguing his IAC claims, just based upon what he read in the record. And if you look at our evidentiary hearing and case law, really all the Supreme Court cases, Wiggins and after, you don't, you have to go beyond that. He had to do more. Any lawyer can read a record and raise an issue. Post-conviction is post-trial. It's beyond the record. He wasn't able to do that. He didn't do it because of state policy making it impossible, because he was one of those pro bono attorneys who volunteered during the donut hole and couldn't get any of the money that was available. Not because he didn't do a good job, because this circuit has said he did a fantastic job. As I would say, being old, Jerry Spence couldn't have gotten money. Jerry Spence, if you know who I'm talking about, could not have gotten money for, to investigate this case under these circumstances. So you, we, our system doesn't owe the state the same deference because they tied his hands. They made it impossible. It's not Nelson. It's not 2254D. It's, it's what's right under Coleman. And that is what this boils down to. And that's what was before Judge DeGraffo when I, on my motion for summary judgment. What is your best case for the idea that we can hold that the state courts erred under state law and the Touche hearing? The Touche hearing is history because in Touche he was talking about being ineffective because of not having money. What's really at issue in my, and this is what we argued to Judge DeGraffo in the motion, and what was amazingly enough supported by the record, is that there is a state policy that said, you pro bono attorney, I don't care who you are. I don't care what federal judge asks you to do this. You do not get money. A policy that ultimately was changed because the Louisiana Supreme Court said, if you don't fix this, that's going to be an issue of due process and equal protection. We cannot have it. And it was ultimately fixed, which is why I get back to the rule of orderliness. I'm not sure you quite answered the question. Oh, I'm sorry. Other than the footnote, what's your answer to the Touche hearing and the fact that the state courts facing Attorney McGee said you had it right there from the mother. The medical, the trauma evidence was told to you by the mother. I'm sorry, that what, what was? The mother was the one who informed them. They didn't need more experts. The mother had the information. Mr. McGee, I think it was then, said that's where it came from. I'm not sure what you're talking about. I will say this, that, um, the, excuse me, but I lost my train of thought. The, this is the thing. That's a hecker issue. We're talking about a guiltless son trying to do his due diligence and post-conviction issue. And because he wasn't able to do it, because like in Michael Williams that I cite in my brief, because it doesn't matter that the judge may have maybe validly denied the, the motion for funding because enough wasn't shown, although he showed a lot, but the point, and maybe they validly denied the writs on Touche, but it didn't change the policy. The judge could have ordered him $5 or 5 million and under the policy, he would never have gotten it. And, and there's nothing that says you do this work without a, even the Fifth Circuit and Wessinger once said, of course you need a mitigation person. That's why he was not in, Soren was not ineffective. He wasn't supposed to go out and knock on those doors. Hecker should have had a mitigation sworn to. Thank you, counsel. Ms. Brown. Thank you, your honors. A few quick points here on rebuttal. I didn't hear any answer to how to get around the self-defeating conundrum. If the evidence couldn't have been uncovered without funding by Gislason, then how was Hecker supposed to find it? We posed that question in our briefing. They had no answer for you today. And that, that defends this case because he needs it to be true that Gislason couldn't have found it, but Hecker could have, even with the same lack of resources. Again, this court really needs to just follow what Wessinger 1 made clear. First, that this case was over. They denied relief. There was no remand, no availability for additional proceedings. And then that this claim was adjudicated on the merits and all of the consequences of that. Again, if you look at back at what Wessinger 1 said, it pointed out that Gislason raised this issue about a failure to introduce evidence regarding his medical history. You go look at the petition itself. It's ROA 12-800-28. There, the petition points out, it says that Billy Hecker failed to investigate Wessinger's medical history. That's still the claim here today. A failure to investigate the abuse, a failure to investigate the medical history to find the supposed brain damage. It's the same claim all the way through. All that has changed is the evidence supporting it. And whether or not the claim was adjudicated on the merits for purposes of 2254d. And Penholster bars the new evidence. So this court is stuck with the state court record. It doesn't matter that there wasn't an evidentiary hearing. It doesn't matter that funding was denied. The state gets to run its own process. And if we were to say there are two tracks and procedural default is a separate and independent track, how would Shin or does Shin play into this at all? As far as regarding the evidentiary hearing issue, Your Honor, I'm trying to make sure I'm following. Shin versus Ramirez makes clear that you cannot, that you can't have a hearing as to procedural default because it has to be regarding the underlying claim and a failure to develop. I think what Shin effectively says is you have to, based on the record developed in the case, show your cause and prejudice. And then as a separate matter as to the claim, you would have to, so you have to have a claim that wasn't presented to the state court in the first place under Shin versus, in order to have an evidentiary hearing. And Shin says we are not going to have an evidentiary hearing as to your cause and prejudice issue. If you had a claim that was not presented on the merits to the, or was not presented to the state court, not adjudicated on the merits, and you are able to overcome cause and prejudice based on the record before the state court, then we turn to whether or not you can overcome the 2254E hurdles. But as Penholster made clear, if the claim was adjudicated on the merits by the state court, you don't get an evidentiary hearing because you can't show that the state court made an unreasonable determination of the funds by citing a bunch of facts that, another reasonable determination of the facts by citing a bunch of facts that were not presented to the state court. That's unfair to the state courts. That's the violation of comity. And again, Wessinger 1 did not say that the state process was ineffective. What it said is that Gislason was impacted by the state court's decision not to award funds and not to have an evidentiary hearing, and that was entitled to deference. And this court was right about that. It's entitled to absolute deference. It can't be reviewed. The state court gets to run its post-conviction process, and that's not a violation of the due process clause by any means. Judge Oldham, you talked earlier about exhaustion. And regarding the 2254B issue, what could have happened way back when had Wessinger's position not been before 2012 that his claim was adjudicated on the merits? That was his argument all the way up until Judge Brady's original decision was that this claim was adjudicated on the merits. He could have, at that point, said, I have this new evidence. I want to return to the state court and ask for a rind stay to go exhaust the claim. He didn't do that, and then it was adjudicated. And of course, it is much, much too late to seek a stay now and to return to the state court. He has to live with litigation decision and that failure to exhaust the claim to the extent that's even true. Again, we disagree with that. It took the jury only 35 minutes to find Wessinger guilty. We should not be here 30 years later still fighting for the justice owed to Stephanie Gazzardo and David Breakwell. We ask this court to reverse, reinstate Wessinger's death sentences, and render judgment for the state. Thank you, counsel. We appreciate the arguments today. The case is submitted, and we stand in recess.